UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| FLEMING ISLAND SHOPPES, LP, and GEORGE P. BROADBENT,<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>THE HUNTINGTON NATIONAL BANK and NATIONAL CITY BANK OF INDIANA,<br><br>　　　　Defendants. | Case No. 1:09-cv-1115-TWP-TAB |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This case represents the latest installment of the fallout generated by a $50 Million loan deal gone awry. Defendants' – The Huntington National Bank ("HNB") and National City Bank of Indiana ("NCB") (collectively, "Defendants" or "Lenders") – Motion for Summary Judgment is currently before the Court. The present motion springs from a declaratory judgment action brought by Plaintiffs – Fleming Island Shoppes, LP ("Fleming Island") and George P. Broadbent ("Broadbent") (collectively, "Plaintiffs") – seeking a declaration of the rights and obligations of Plaintiffs and Defendants under a Master Loan Agreement ("MLA") and a related Project Agreement. Defendants counterclaimed, asserting they are entitled to a judgment against Fleming Island based on certain mortgage notes and a judgment against Broadbent stemming from an individual guaranty. For the reasons set forth below, Defendants' Motion for Summary Judgment [Dkt. 31], which encompasses both Plaintiffs' claims and Defendants' counterclaims, is **GRANTED** in its entirety.

# I. BACKGROUND[1]

In 2005, Lenders attempted to woo George Broadbent by offering his business entities a $50,000,000 line of credit to develop commercial real estate. In the process, on February 6, 2006, the parties devised a "Term Sheet" ("Term Sheet"), which purported to set forth key terms and conditions of the proposed transaction. On February 23, 2006, Lenders and The Broadbent Development Company ("Broadbent Development") finalized a deal, albeit one that deviated from the Term Sheet quite significantly. This deal is embodied in the Master Loan Agreement, which stands at the heart of the present dispute.

## A. Nature of Loans Contemplated by the Master Loan Agreement

Under the MLA, Lenders agreed to make "Project Loans" to "Borrowers" designated by Broadbent Development from time to time, in an aggregate principal amount not to exceed $50 Million at any time. Project Loans are specifically defined as, "for a Project the amount of the Loan approved by the Lenders and allocated to pay Project Costs for such Project . . ." Further, the MLA contemplates that a "Project Agreement" will be entered into between Borrowers and Lenders for each Project. A "Project" is defined as "a Project Site and the Improvements located or to be constructed thereon."

## B. The Fleming Island Project Loans

Broadbent Development designated Fleming Island as a Borrower under the MLA. On May 30, 2006, Fleming Island and Huntington National Bank (acting on behalf of Lenders) entered into a Project Agreement ("FI Project Agreement"), which expressly incorporated all of

---

[1] In a somewhat unorthodox fashion, the Court occasionally references and summarizes party arguments in this section.

the MLA's terms and conditions. Pursuant to the FI Project Agreement, Lenders made Project Loans to Fleming Island to acquire 13.67 acres of real estate in Jacksonville, Florida and to construct a retail center and develop six outlots thereon ("FI Project"). The FI Project Loans consisted of two loans: (1) a construction loan for $9,390,000 ("Construction Loan") to fund construction; and (2) an outlot loan for $3,450,000 ("Outlot Loan") to acquire and develop the six outlots (collectively, the Construction Loan and the Outlot Loan are referred to as "FI Project Loans"). The FI Project Loans are evidenced by four mortgage notes ("FI Project Notes"). In connection with the FI Project Loans, Fleming Island executed a Real Estate Mortgage And Security Agreement (Fixture Filing) ("Mortgage") and Broadbent executed a Guaranty of Payment ("Guaranty").

**C.** **Key MLA Terms**

This case centers on whether or not Plaintiffs can extend the maturity date of the FI Project Loans. Section 2.06 of the MLA speaks to this very issue:

> **2.06. Project Maturity Date**. The term of a Project Loan shall mature thirty-six (36) months from the Closing Date (the "Original Maturity Date"), unless such Project Loan is sooner paid or extended pursuant to the terms hereof. Each Project Loan may be extended by Borrower for an additional period of sixty (60) months (the "Extended Maturity Date") <u>so long as no Event of Default has occurred, such Project has a Debt Service Coverage Ratio of not less than 1.20 to 1.00 if such Project is a retail facility</u> or 1.30 to 1.00 if such Project is a self storage facility.

(Emphasis added). The FI Project Loans closed May 30, 2006, meaning that without an extension, they would be due 36 months later, on May 30, 2009. With an extension, however, they would not be due until May 30, 2014. Pursuant to Section 2.06, extensions will be granted, unless: (1) Fleming Island committed an "Event of Default"; or (2) the Fleming Island Project

3

has a "Debt Service Coverage Ratio of not less than 1.20 to 1.00." Lenders maintain that Fleming Island is disqualified from extending the FI Project Loans on both grounds. Fleming Island, of course, vigorously disagrees.

Lenders devote their opening brief to the argument that Fleming Island's Debt Service Coverage Ratio ("DSCR") was too low to qualify for an extension on the FI Project Loans. Thankfully, the MLA fleshes out the meaning of DSCR, defining it as follows:

> "Debt Service Coverage Ratio" shall mean the ratio of (a) annualized gross revenues received for the Project for the most recent three (3) month period, less the greater of the (i) projected total annual expenses for the Project, including an annual management fee in an amount equal to the greater of Five Percent (5%) of the total annual income of the Project or the actual management fees paid by such Borrower, an annual charge of Fifteen Cents ($.15) per square foot of the Project for a capital reserve and expenses of common area maintenance, insurance, real estate taxes, and non-capitalized repairs, or (ii) the proforma expenses set forth in the Appraisal to (b) the projected total annual sum of all interest payments and principal payments on the Loan which would be due and payable assuming the level amortization of such Loan over a period of twenty-five (25) years, at a per annum interest rate equal to the greater of (i) two percent (2%) above the Treasury Rate, but not less than six and one-half percent (6-1/2%) per annum, or (ii) the then current interest rate on the Project Loan.

Stated differently, and hopefully more digestibly, the Debt Service Coverage Ratio compares a given Project's annualized gross revenues based on the "most recent three (3) month period,"[2] less certain deductions, to the projected annual cost of making payments on the related Project Loans, using an assumed amortization level and interest rate. More simplistically, the DSCR is a ratio with the numerator relating to income and the denominator relating to debt. If the DSCR is greater than 1.20/1, a loan's maturity date is eligible for an extension. If the DSCR is less than

---

[2]Plaintiffs emphasize that the MLA's DSCR definition conflicts with the Term Sheet, which provides, "The income side of the calculation will be based upon the annualized contractual in-place lease revenues, plus other income sources."

4

1.20/1, an extension will be denied.

The other ground disqualifying a loan for extension, an "Event of Default," is governed by Section 8.01 of the MLA, which provides in part:

> **8.01. Events of Default.** By acceptance of a Project Loan, the Borrower thereunder agrees if one or more of the following described events shall occur (an "Event of Default") and be continuing or shall exist:
>
> > a. Such Borrower shall fail to make any payment under any Project Notes evidencing a Project Loan within ten (10) days after the date the same is due and payable;
>
> ***
>
> then, and upon the occurrence of any such event, the Lenders shall be under no further obligation to make any Advances under such Project Loan and such Project Loan and interest accrued thereon and any penalty or premium thereunder and all other liabilities of such Borrower hereunder, thereunder and under the other Project Loan Documents in respect of such Project Loan shall thereupon become and be immediately due and payable without presentment, demand, protest, or notice of any kind and without relief from valuation and appraisement laws, all of which are hereby expressly waived.

**D.     Fleming Island Seeks an Extension**

By a letter dated February 9, 2009, Fleming Island attempted to extend the terms of the FI Project Loans, alleging that it had fulfilled Section 2.06's requirements. To substantiate its DSCR, Fleming Island attached a three-page document containing calculations ("DSCR Calculations"), showing a DSCR of exactly 1.20/1, barely meeting the threshold for an extension. Lenders refused the extension as under the Lenders' calculations, the DSCR was well below 1.20/1. Without the extension, the FI Project Loans matured on May 30, 2009. On June 18, roughly three weeks after the due date, HNB formally notified Fleming Island that it was in default on the FI Project Loans and demanded immediate payment of the outstanding balance

5

and accrued interest under the FI Project Notes. As of January 8, 2010, the unpaid principal and accrued interest amounted to a hefty sum, $12,486,063.85.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). Neither the mere existence of some alleged factual dispute between the parties, nor the existence of some metaphysical doubt as to the material facts will defeat summary judgment. *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted). "Generally, construction of a written contract is a question of law for which summary judgment is particularly appropriate." *Slutsky-Peltz Plumbing & Heating Co., Inc. v. Vincennes Cmty. School Corp.*, 556 N.E.2d 344, 346 (Ind. Ct. App. 1990) (citation omitted).

## III. DISCUSSION

A.   The Parties' Opening Arguments

The parties' briefing took a number of dizzying twists and turns. To better explain its ruling, the Court will recap the evolution of the parties' arguments.

### 1. Lenders' Opening Brief

As mentioned above, Lenders' opening brief [Dkt. 32] focused single-mindedly on the flaws in Fleming Island's DSCR calculation, on both sides of the ledger. Lenders argued that the income side (numerator) was artificially inflated, whereas the debt side (denominator) was artificially deflated. To that end, Lenders highlighted that the income side included gross revenues that had not yet been earned, even though the DSCR calculation is unambiguously based on "the most recent three (3) month period." If these unearned revenues are jettisoned from the calculation, Fleming Island's DSCR plunges, disqualifying the FI Project Loans for an extension. Lenders also allege that Fleming Island took impermissible liberties on the debt side of the equation, failing to include the Outlot Loan. The DSCR definition requires the debt side to include "the projected total annual sum of all interest payments and principal payments of the Loan." The correct DSCR calculation, Lenders argue, falls well short of the 1.20/1 ratio required to earn an extension under the MLA.

### 2. Plaintiffs' Response

Plaintiffs' Response countered that their DSCR calculation complied with the MLA's (amended) parameters. On the income side of the ratio, Plaintiffs argue the parties' post-execution conduct and communications modified clause (a) of the DSCR Definition to permit the

inclusion of projected income from "contractual in-place lease revenues." Plaintiffs point to a variety of evidence to bolster this position. However, given the Court's ruling, the strength of this argument need not be assessed.

On the debt side, Plaintiffs contend that only the Construction Loan (not the Outlot Loan) should be included in the DSCR because the word "Loan" is ambiguous and uncertain in its meaning. The MLA defines the word "Loan" as "the aggregate amount of the Project Loans approved by a Lender or Lenders pursuant to [the MLA], which amount shall in no event exceed the principal sum [$50,000,000] outstanding at any time." Both parties avoid this definition (for their own distinct reasons) and urge the Court to reject an overly-literal construction.[3] Given this backdrop, Plaintiffs argue that it "is reasonable to interpret the word 'Loan' in Clause (b) to mean only those Project Loans made to develop retail facilities," like the Construction Loan, but not the Outlot Loan. [Dkt. 76 at 22]. Plaintiffs claim that the extrinsic evidence supports this interpretation. Once again, the persuasiveness of this argument need not be assessed in detail.

Significantly, in forging the latter argument, Plaintiffs make an important concession, which ultimately proves dispositive. For the first time in this case, Plaintiffs admit that "by asserting a right to extend the term of the Outlot Loan by 60 months in its letter of February 9, 2009, it sought relief to which it was not entitled under the MLA." [Dkt. 76 at 25 n. 6]. In other words, Fleming Island admits it was not entitled to an extension on the Outlot Loan, meaning that pursuant to Section 8.01 of the MLA, it unquestionably defaulted on the Outlot Loan.

With the Outlot Loan issue resolved, the Court turns to the following question: In light of

---

[3] Both parties concede that the definition of the word "Loan" cannot be interpreted literally, as this would require the comparison of income from a *single* Project to *all* of the debt under the MLA, even the debt from unrelated Projects and different Borrowers.

Section 8.01 of the MLA, did Fleming Island necessarily default on the Construction Loan, too? If the answer to that question is "Yes," then Fleming Island is not entitled to an extension on the Construction Loan, meaning it has defaulted and summary judgment is warranted.

**B.     Is Section 8.01 a Cross-Default Provision?**

Section 8.01 of the MLA spells out what constitutes "Events of Default" and the consequences of defaulting. By their own admission, Plaintiffs defaulted on the Outlot Loan. Not surprisingly, the parties strongly dispute the implications of this admission and the reach of Section 8.01.

In determining whether or not Section 8.01 is a cross-default provision, the Court must rely on bedrock principles of contract interpretation. In contract cases like this one, the Court's primary objective is to effectuate the intent of the parties at the time the contract was made, which is determined by examining the language the parties used to express their rights and duties. *Trustcorp Mortg. Co. v. Metro Mortg. Co.*, 867 N.E.2d 203, 213 (Ind. Ct. App. 2007) (citations omitted). The Court must read the contract as a whole, construing language to give meaning to all of the contract's words, terms, and phrases. *Id*. at 213 (citation omitted). Likewise, the Court must accept a contract interpretation that harmonizes provisions, not one that places provisions in conflict. *Id*. (citation omitted). Here, the parties dispute the meaning of a contract provision, but this is hardly unusual. The law is well-settled that differing, self-interested interpretations do not create ambiguity. *See Ind. Dept. of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d 1063, 1069 (Ind. Ct. App. 2001) (citation omitted). Instead, a contract is ambiguous only when it is "susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning." *Id*. at 1069-70 (citation omitted). Absent

9

ambiguity, the Court must give the contract terms a plain and ordinary meaning. *Id*. at 1070 (citation omitted).

To reiterate, Section 8.01 reads as follows:

> **8.01. <u>Events of Default</u>.** By acceptance of <u>a Project Loan</u>, the Borrower thereunder agrees if one or more of the following described events shall occur (an "Event of Default") and be continuing or shall exist:
>
> > a. Such Borrower shall fail to make <u>any payment under any Project Notes evidencing a Project Loan</u> within ten (10) days after the date the same is due and payable;
>
> ***
>
> then, and upon the occurrence of any such event, the Lenders shall be under no further obligation to make any Advances <u>under such Project Loan and such Project Loan</u> and interest accrued thereon and any penalty or premium thereunder <u>and all other liabilities of such Borrower hereunder</u>, thereunder and under the other Project Loan Documents in respect of such Project Loan <u>shall thereupon become and be immediately due and payable</u> without presentment, demand, protest, or notice of any kind and without relief from valuation and appraisement laws, all of which are hereby expressly waived.

(Emphasis added). Plaintiffs argue that the Outlot Loan and the Construction Loan are separate loans, evidenced by separate FI Project Notes. Therefore, a default on the Outlot Loan does not trigger liability under the FI Project Notes undergirding the Construction Loan.

For multiple reasons, however, the Court respectfully disagrees. First, Plaintiffs' interpretation ignores the phrase "all other liabilities of such Borrower hereunder." The Court construes this phrase to mean that if a Borrower defaults on one of its loans, then its other loans under the MLA become immediately due and payable. If the parties wished to confine liability flowing from an "Event of Default" to a single loan, they would have avoided such encompassing language.

Second, the Court finds the use of the following ostensibly innocuous words meaningful: "a," "any," and "such." To flesh this out fully, it is necessary to partition Section 8.01 into three pieces: (1) the introductory clause (from "By acceptance" to "shall exist"); (2) the default event clause (from "Such borrower" to "due and payable"); and (3) the consequences clause (from "then, and upon the occurrence of" to "hereby expressly waived."). The first and third clauses unambiguously refer to the same Project Loan. This loan, however, is not necessarily the same loan referenced in the second clause. After all, the second clause uses the phrase "*any* payment under *any* notes evidencing a Project Loan." If the parties wanted the loan in the second clause to refer to the same loan referenced in the first and third clause, they could have done so easily by using the phrase "such Loan" – just as they did in the third clause. Analyzed in a comprehensive fashion and applied to the present circumstances, Section 8.01 means that Fleming Island, by accepting the Construction Loan, agreed that if a Section 8.01(a) "Event of Default" occurred, then the Construction Loan would become immediately due and payable. Unquestionably, Fleming Island committed an "Event of Default" with respect to the Outlot Loan. Given the language and structure of Section 8.01, this failure to pay the Outlot Loan amounts to an "Event of Default" on the Construction Loan, too.

Finally, from a business end, Plaintiffs' interpretation makes little economic sense. It would, after all, allow a Borrower to default on one loan while simultaneously receiving an extension on another loan, even though both loans are closely related and stem from the same Project Agreement. On the flip side of the coin, Plaintiffs' interpretation (at least under these circumstances) would *require* Lenders to extend the maturity date on one loan, even though Borrower just defaulted on a companion loan. The MLA clearly contemplated that loans would

11

not be extended unless the Project had demonstrated a baseline ability to generate adequate revenue to pay off Project Loans. Plaintiffs' interpretation would defy this overarching goal. *See, e.g., Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1118-19 (7th Cir. 2002) (applying Indiana law and rejecting contract interpretation that made no economic sense). For these reasons, summary judgment on Plaintiffs' claims is warranted.

**C.     Lenders' Counterclaims**

Necessarily following from the Court's ruling, Lenders are entitled to recover the amounts owed in connection with the FI Project Loans and under the FI Project Notes. The FI Project Notes expressly state that their payment is governed by the terms of the MLA. Pursuant to Section 2.07(c) of the MLA, the entire outstanding principal balance of each of the FI Project Notes, together with the accrued and unpaid interest thereon, became due and payable when the FI Project Loans matured May 30, 2009, and an Event of Default occurred pursuant to Section 8.01 when the FI Project Loans were not paid in a timely fashion. Moreover, pursuant to Section 3.03 of the Mortgage executed by Fleming Island in connection with the FI Project Loans, Lenders are entitled to reasonable attorneys' fees based on this litigation. Finally, Lenders are entitled to a judgment against Broadbent based on the Guaranty, under which he unconditionally guaranteed punctual payment of the FI Project Notes and reasonable attorneys' fees pursuant to Paragraph 10 of the Guaranty.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment [Dkt. 31] is **GRANTED** in its entirety.

SO ORDERED: 02/01/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Copies to:

**Rex E. Bennett**
FROST BROWN TODD LLC
rbennett@fbtlaw.com,vhilgert@fbtlaw.com

**Jacob V. Bradley**
FROST BROWN TODD LLC
jbradley@fbtlaw.com,award@fbtlaw.com

**Darren Andrew Craig**
FROST BROWN TODD LLC
dcraig@fbtlaw.com,jwhitaker@fbtlaw.com

**Phil L. Isenbarger**
BINGHAM MCHALE, LLP
pisenbarger@binghammchale.com,jibsen@binghammchale.com

**Richard A. Kempf**
TAFT STETTINIUS & HOLLISTER LLP
rkempf@taftlaw.com,docket@taftlaw.com,kmickel@taftlaw.com

**Nathan Lee Lundquist**
BINGHAM MCHALE LLP
nlundquist@binghammchale.com

**James M. Matthews**
FROST BROWN TODD LLC
jmatthews@fbtlaw.com,dacree@fbtlaw.com

**Whitney L. Mosby**
BINGHAM MCHALE LLP
wmosby@binghammchale.com,mmcclain@binghammchale.com

**Peter Jon Prettyman**
TAFT STETTINIUS & HOLLISTER LLP
pprettyman@taftlaw.com,docket@taftlaw.com,pkeener@taftlaw.com

**Thomas C. Scherer**
BINGHAM MCHALE LLP
tscherer@binghammchale.com,mmcclain@binghammchale.com

**Steven C. Shockley**
TAFT STETTINIUS & HOLLISTER LLP
sshockley@taftlaw.com,docket@taftlaw.com,kmickel@taftlaw.com